# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 20, 2012

No. 11-10070

Lyle W. Cayce
Clerk

In the Matter of:  MIRANT CORPORATION,

Debtor

---

MC ASSET RECOVERY LLC,

Appellant–Cross Appellee

v.

COMMERZBANK A.G.; ABN AMRO, INCORPORATED; BARCLAYS BANK
PLC; BNP PARIBAS; CALYON; DANKSE BANK; ING BANK; ROYAL BANK
OF SCOTLAND; BANCA INTESA,

Appellees–Cross Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before BENAVIDES and PRADO, Circuit Judges, and ALVAREZ,[*] District
Judge.

MICAELA ALVAREZ, District Judge.

The district court denied Defendants' motion to dismiss based on Plaintiff's
alleged lack of standing.  Thereafter, the district court granted summary
judgment for Defendants.  Both sides appealed.  While we agree that the district

---

[*]District Judge of the Southern District of Texas, sitting by designation.

court correctly determined that there was standing to bring the avoidance claim, we vacate the judgment of dismissal because the district court erroneously applied Georgia rather than New York state law to the avoidance claim.

## I. BACKGROUND

### A.    Factual Background

Mirant Corporation ("Mirant") was an energy company with its headquarters in Georgia. Mirant sought to expand its European operations by acquiring nine power islands from General Electric. Mirant did not seek to acquire the power islands directly, but was acting through its subsidiary Mirant Asset Development and Procurement B.V. ("MADP"). Commerzbank provided financing for the power island transaction. As part of the financing agreement between Commerzbank and MADP, Mirant issued a guaranty (the "Guaranty") which guaranteed the amounts owed by Mirant's subsidiary, MADP. Commerzbank later syndicated the loan facility to other lenders. Eventually, the European power island deal fell through, and Mirant made payments pursuant to the Guaranty. Soon thereafter, Mirant sought bankruptcy protection.

### B.    Procedural Background

Mirant, as debtor-in-possession,[1] sued Commerzbank and other lenders in bankruptcy court to avoid the Guaranty and to recover the funds Mirant paid pursuant to the Guaranty. Mirant's bankruptcy plan provided for the creation of a special litigation entity. After Mirant's bankruptcy plan was confirmed, MC Asset Recovery, LLC ("MCAR") substituted into the case for Mirant, which was acting as debtor-in-possession.

---

[1] Although Mirant was a debtor-in-possession, the issues in this case focus primarily on the powers of a bankruptcy trustee. This is because a debtor-in-possession has many of the powers of a bankruptcy trustee. *See* 11 U.S.C. § 1107.

Commerzbank and other lenders filed a motion to dismiss based on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In the motion to dismiss, they argued that MCAR lacked standing and that MCAR failed to state a claim upon which relief could be granted because MCAR could neither use the Federal Debt Collection Procedures Act ("FDCPA") to avoid the Guaranty nor could MCAR avoid the Guaranty under other applicable law. The parties' disagreement about what law was applicable law raised a choice-of-law issue. The bankruptcy court decided to consider additional evidence on the choice-of-law issue and converted the 12(b) motion into a motion for summary judgment. The bankruptcy court filed proposed findings of fact and conclusions of law. The district court found that MCAR had standing, but granted summary judgment against MCAR because it found that the FDCPA was not applicable law under 11 U.S.C. § 544(b) and it found that the law of Georgia, which it determined to be the applicable state law under § 544(b), did not permit avoidance of the Guaranty.

## II. DISCUSSION

MCAR appealed the district court's determinations that the FDCPA is not applicable law under 11 U.S.C. § 544(b) and that Georgia law is the applicable state law under § 544(b). Commerzbank and other lenders (collectively "Lenders") cross-appealed the district court's determination that MCAR has standing to pursue avoidance actions.

### A.   Standard of Review and Applicable Law

We review the district court's determination that MCAR has standing de novo. *Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006). "[W]e take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citation omitted). "[U]nder Rule 12(b)(1), the court may find a plausible set of

facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (citation and internal quotation marks omitted).

The district court's summary judgment determinations that FDCPA is not applicable law under § 544(b) and that Georgia law applies instead of New York law are also reviewed de novo. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citation omitted). The factual determinations made by the district court in its choice-of-law analysis are reviewed for clear error. *Hartford Underwriters Ins. Co. v. Found. Health Servs. Inc.*, 524 F.3d 588, 592 (5th Cir. 2008) (citation omitted). "A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Barker v. Halliburton Co.*, 645 F.3d 297, 299 (5th Cir. 2011) (citation and internal quotation marks omitted).

## B.    Whether MCAR has Article III Standing

Lenders claim that because Mirant's creditors have been paid in full, MCAR does not have standing to pursue an avoidance action. The Court disagrees.

Constitutional standing requires three elements:

First, the plaintiff must have suffered an "injury in fact"–an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely

4

"speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (internal citations omitted).

Federal courts disagree whether plaintiffs in positions similar to MCAR's have standing. In *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008), a district court found that because the relevant creditors had been paid in full and would receive no benefit from avoiding a transfer, Adelphia Recovery Trust did not have standing under 544(b) to assert an avoidance claim. *Id.* at 91-97.

In *Stalnaker v. DLC, Ltd.*, 376 F.3d 819 (8th Cir. 2004), the unsecured creditors settled their claims against the estate on the eve of trial. *Id.* at 821. Thereafter, the trustee attempted to avoid a fraudulent transfer, and the transferee objected and argued that the trustee could no longer pursue an avoidance action. *Id.* at 822-23. Despite the fact that the unsecured creditors had settled their claims, the Eighth Circuit sided with the trustee because avoiding the transfer would still benefit the bankruptcy estate as required by § 550(a). *Id.* at 823-824. Central to this decision is the assessment that "the bankruptcy 'estate' is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors." *Id.* at 823. The Eighth Circuit also noted that in that case there were still administrative claims that needed to be paid out of the estate. *Id.* at 823-824. "We find no authority for the proposition that a debtor may settle with unsecured creditors on the eve of trial, thereby thwarting professionals in their attempt to collect fees for at least four years of work to administer the bankruptcy estate." *Id.* at 824.

*In re Acequia*, 34 F.3d 800 (9th Cir. 1994), is a case in which the Ninth Circuit allowed a trustee to pursue an avoidance action even though "the

corporation paid all unsecured creditors in its plan of reorganization." *Id.* at 807-812. The Ninth Circuit made three basic points. First, the "existence of a section 544(b) cause of action" should be evaluated at the time the bankruptcy petition is filed. *Id.* at 807 (citation omitted). Second, the Bankruptcy Code authorizes post-confirmation pursuit of a debtor's causes of action. *Id.* (citing 11 U.S.C. § 1123(b)(3)(B) (additional citations omitted)). "[T]hird, if confirmation and payment precluded application of section 544(b), debtors undoubtedly would delay filing plans of reorganization until completing all potential litigation, a result that would contravene the Bankruptcy Code's goal of quick and equitable reorganization." *Id.* (citation omitted).

Under the law of this circuit, a trustee's right to avoid a transfer is tested at the petition date.

> Central to this bankruptcy is the trustee's power under § 544(b), which allows him to succeed to the actual, allowable and unsecured claims of the estate's creditors. If an actual, unsecured creditor can, *on the date of the bankruptcy*, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and "avoid" the debtor's transfer. Although the cause of action belonged to one creditor, any property the trustee recovers becomes estate property and is divided *pro rata* among all general creditors. The trustee may recover the full extent of the fraudulently transferred property on the basis of one creditor's claim. In other words, an entire transfer may be set aside even though the creditor's claim is nominal.

*In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010) (internal citation and quotation marks omitted) (emphasis added).

Furthermore, the Court agrees with the approach taken by the Eighth and Ninth Circuits. Once a trustee's avoidance rights are triggered at the time of filing, they persist until avoidance will no longer benefit the estate under § 550.

6

A bankruptcy trustee may still have standing to avoid a fraudulent transfer after the unsecured creditors are satisfied in full. The fraudulent transfer injured the estate and § 550 ensures that the injury is redressed because a trustee may only avoid a transfer *to the extent it benefits the estate*. Therefore, to the extent that MCAR's successful avoidance of fraudulent transfers will benefit the bankruptcy estate, MCAR has Article III standing to avoid transfers that injured the estate.

## C.     Whether the Federal Debt Collection Procedures Act is "applicable law" under 11 U.S.C. § 544(b)

MCAR asserts that the FDCPA is applicable law under 11 U.S.C. § 544(b). The Court disagrees. Both the statutory language and the legislative history of the FDCPA indicate that it is not applicable law under § 544(b).

### 1.     Statutory Language

The FDCPA addresses how that legislation interacts with Title 11. The FDCPA states that "[t]his chapter shall not be construed to *supersede or modify* the operation of–(1) title 11." 28 U.S.C. § 3003(c) (emphasis added).

MCAR argues that § 3003(c) simply means that the FDCPA should be treated exactly like any other "applicable law" available to the trustee in bankruptcy. On this theory, § 3003(c)'s mandate that the FDCPA not modify or supersede Title 11 is only fulfilled by seamlessly incorporating the FDCPA into the bankruptcy code. Lenders argue that allowing the trustee to use the FDCPA as "applicable law" under § 544(b) will necessarily "modify" Title 11.

This Court has previously dealt with a phrase similar to "supersede or modify." In the bankruptcy case *Matter of Volpe*, 943 F.2d 1451 (5th Cir. 1991), this Court considered how 11 U.S.C. § 522(b)(2), which allows states to create a list of property that debtors may exempt from the bankruptcy estate, and laws enacted pursuant to § 522(b)(2) interacted with an ERISA provision that might

7

have otherwise preempted state law. *Id.* at 1451-1453. Specifically, the appellants in *Volpe* argued that ERISA preempted § 42.0021 of the Texas Property Code, which was enacted pursuant to § 522(b)(2). *Id.* at 1451-1452. In *Volpe* we first highlighted the portion of ERISA which states that "'[n]othing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.'" *Id.* at 1452 (quoting 29 U.S.C. § 1144(d)). Second, we pointed out that allowing ERISA to preempt § 42.0021 would impermissibly "'modify' or 'impair' the enforcement scheme of the United States Bankruptcy Code." *Id.* at 1452-1453 (citing *Heitkamp v. Dyke*, 943 F.2d 1435 (5th Cir. 1991), *abrogated on other grounds by Patterson v. Shumate*, 504 U.S. 753 (1992)) (additional citations omitted). Therefore, we rejected appellants' preemption argument. *Id.* at 1452-1453.

Similarly, the Court finds that treating the FDCPA as applicable law under 544(b) would impermissibly modify the operation of Title 11. Therefore, 28 U.S.C. § 3003(c) does not permit the FDCPA to be used as applicable law under § 544(b).

## 2.    Legislative History

Although the legislative history is not dispositive, it does support the Court's determination that the FDCPA is not applicable law under 11 U.S.C. § 544(b). In discussing the FDCPA, Committee Chairman Brooks stated,

> As the author of the final version of the Federal Debt Collection Procedures Act, to which the Senate has now formally agreed, I want to discuss some aspects of the legislation to make sure they are fully understood . . . . The act makes several clarifications to resolve potential ambiguities in its application or in its effect on other laws. One of those clarifications is that the act "shall not be construed to supersede or modify the operation of * * * title 11," United States Code-the Bankruptcy Code. This provision was

8

> carefully worded to make clear that the act would have absolutely no effect on the Bankruptcy Code; even provisions of the Bankruptcy Code making reference to nonbankruptcy law are to be read as if this act did not exist. The only exception is the provision in section 201 of the act, which amends a specific provision of the Bankruptcy Code.

136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement of Rep. Jack Brooks). Therefore, the Court's decision that the FCPA is not applicable law under § 544(b) is consistent with Representative Brooks's statement that the Bankruptcy Code should be read as if the FDCPA did not exist.

**D.    Whether New York or Georgia Fraudulent Transfer Law Applies**

The parties disagree over what constructive fraudulent transfer law applies to this case. MCAR argues that New York law applies, but Lenders assert that Georgia law applies. The district court found that Georgia law applies. For the reasons stated below, the Court reverses and remands the case to the district court for the application of New York law.

This circuit has not determined whether the independent judgment test or the forum state's choice-of-law rules should be applied in bankruptcy. *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (1981). Avoidance actions pursuant to 11 U.S.C. § 544(b) sound in tort. *Tow v. Rafizadeh* (*In re Cyrus II P'ship)*, 413 B.R. 609, 619 (Bankr. S.D. Tex. 2008). In tort cases, Texas courts apply "the 'most significant relationship' test as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts." *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (1979). Because the independent judgment test "is 'essentially synonymous with the most significant relationship approach adopted by' the Restatement (Second) Conflict of Laws" *Tow,* 413 B.R. at 615 (quoting *Kaiser Steel Corp. v. Jacobs* (*In re Kaiser Steel Corp.*)*,* 87 B.R. 154, 158 (Bankr. D. Colo. 1988)), the Court need not resolve which choice-of-law

test applies here. In either case, Sections 6 and 145[2] of the Restatement (Second) of Conflict of Laws (the "Restatement") provide the appropriate analytical framework. The Court will thus employ those sections of the Restatement to determine whether New York or Georgia law applies here.

The Court emphasizes that both New York and Georgia have sufficient contacts with this issue for their constructive fraudulent transfer laws to be properly considered for application in this case. The Court will begin by

---

[2] **RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6 & 145 (1971).**

**§ 6. Choice-Of-Law Principles**

(1)  A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2)  When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

**§ 145. The General Principle**

(1)  The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2)  Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

evaluating the § 145 contacts because those contacts provide the backdrop for the § 6 analysis.

As explained below, the specific facts of this case minimize the relevance of the § 145 contacts in the choice-of-law analysis. Significantly, the injury in this case is intangible. Not only does this make it very difficult to assign a meaningful location to the injury, the commentary to the Restatement suggests that when the injury is intangible the importance of this factor is severely diminished. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). Similarly, the facts of this case make it nearly impossible to define what conduct caused the injury and the place where that conduct occurred. Here, it is not necessary to definitively identify or locate the relevant conduct because constructive fraudulent transfer laws are more concerned with helping injured parties than deterring conduct. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. c (1971). Because the record indicates that there are relevant parties in both New York and Georgia, this factor does not favor either state. Finally, there is no one location where the relationship of the parties is clearly centered, and this factor is not particularly relevant on these facts. Ultimately, even if the Court were to determine that the § 145 contacts slightly favor the application of Georgia law, these contacts are of limited importance in this case.

Now the Court turns to the § 6 analysis which strongly favors the application of New York law. The Court conducts this analysis mindful of the basic policies underlying the fraudulent transfer laws, which, as noted in the commentary to the Restatement,

> [are] of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply

the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restatement (Second) of Conflict of Laws § 6  cmt. h (1971).  Here, the basic policy at issue is the protection of creditors from fraudulent transfers.  As it pertains to guarantees, New York's law follows the majority approach[3] which treats certain guarantees as transfers under its fraudulent transfer law.  On the other hand, Georgia's now-repealed statute does not treat guarantees as transfers.

When the entire corpus of fraudulent transfer law is considered, the differences between these two laws are minor.  This factor favors the application of the law that best achieves the basic policy underlying this particular field of law.  In this instance, the choice is clear.  New York's law promotes the underlying policy of protecting creditors from fraudulent transfers regardless of the specific form of those transfers.  On the other hand, Georgia's now-repealed statute exempts transactions that most states identify as fraudulent transfers merely because they were structured as guarantees.  Thus, the basic creditor protection policy underlying fraudulent transfer law will be better served by the application of New York law in this case.

Turning to the needs of the interstate system, "[c]hoice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them."  Restatement (Second) of Conflict of Laws § 6 cmt. d (1971).  Here, the needs of the interstate system are best met by the application of New York's law which reflects the approach taken

---

[3] The Uniform Fraudulent Transfer Act, which subjects certain guarantees to fraudulent transfer law, has been adopted by 43 states.  *Legislative Fact Sheet - Fraudulent Transfer Act*, Uniform Law Commission, http://www.nccusl.org/LegislativeFactSheet.aspx?title =Fraudulent%20Transfer%20Act (last visited Feb. 9, 2012).

by an overwhelming majority of the states. Similarly, an application of New York law will promote the Restatement's goal of uniformity of result.

While the application of Georgia's now-repealed statute would benefit Lenders, none of them are citizens of Georgia. The fact that in this case Georgia's citizens would not benefit from the application of Georgia law diminishes Georgia's interest. Also, Georgia has replaced its repealed statute with one that treats guarantees as transfers for the purposes of fraudulent transfer law. Thus, Georgia has little interest in applying its now-repealed statute to this case where its citizens have nothing to gain from the application of that statute.

Even assuming that the § 145 contacts slightly favor the application of Georgia law, Georgia has little interest in applying its now-repealed, minority approach statute when its citizens would not benefit from its application. While none of the § 6 factors support the application of Georgia law, several favor the application of New York law. Even when the § 6 analysis is conducted against a backdrop that assumes that § 145 weakly favors Georgia law, § 6 completely favors the application of New York law in this case. We find that the district court erred in applying the now-repealed Georgia law rather than New York law to the avoidance claim. Accordingly, the judgment dismissing MCAR's claim is vacated and remanded for further proceedings consistent with this opinion.

## III. CONCLUSION

The judgment of dismissal is VACATED and the case is REMANDED.