**In re ASARCO LLC, et al., Debtors.**

**Mt. McKinley Insurance Company, f/k/a Gibraltar Casualty Company, and Everest Reinsurance Company, f/k/a Prudential Reinsurance Company, Appellants,**

v.

**Lac D'Amiante Du Quebec LTEE, Capco Pipe Company, Inc., Cement Asbestos Products Company, Lake Asbestos of Quebec, Ltd., LAQ Canada, Ltd., and Asarco LLC, Appellees.**

No. 2:12–CV–271.
Bankruptcy No. 05–21207.
Adversary Nos. 07–2025, 07–2069.

United States District Court,
S.D. Texas,
Corpus Christi Division.

Signed Nov. 19, 2012.

Bryan S. Dumesnil, Bracewell Giuliani LLP, Charles A. Beckham, Jr., Elizabeth Brooks Hamilton, Haynes and Boone, LLP, Kenneth R. Wynne, Wynne & Wynne LLP, Trey Andrew Monsour, K & L Gates LLP, Houston, TX, Charles J. Filardi, Jr., Filardi Law Offices LLC, New Haven, CT, Colin David Moore, Provost Umphrey LLP, Beaumont, TX, Daniel J. Healy, Rhonda D. Orin, Anderson Kill L.L.P., Washington, DC, Robert Michael Horkovich, Anderson Kill and Olick PC, Douglas Paul Bartner, Shearman and Sterling LLP, New York, NY, Elena Kilberg, Fred Neufeld, Robert Jay Moore, Milbank Tweed Hadley & McCloy LLP, Gregory L. Evans, Integer Law Corporation, Los Angeles, CA, Gerald L. Shelley, Jimmy Farah Dahu, Louis D. Lopez, Fennemore Craig PC, Phoenix, AZ, Marty L. Brimmage, Jr., Akin Gump Strauss Hauer & Feld LLP, Dallas, TX, for Debtor Asarco LLC, et al.

Charles B. Walther, Tony L. Draper, Walker Wilcox Matousek LLP, Houston, TX, Richard White Crews, Jr., Hartline Dacus et al., Corpus Christi, TX, for Appellant Mt. McKinley Insurance Company f/k/a Gibraltar Casualty Company.

Sander L. Esserman, Stutzman Bromberg et al., Dallas, TX, for Appellee Lac D'Amiante du Quebec Ltee.

Jacob Lee Newton, Steven A. Felsenthal, Stutzman Bromberg et al., Dallas, TX, Michele Gallagher, Anderson Kill et al., Washington, DC, for Appellee Asarco LLC.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

## I. Background

### A. The 2001 Lawsuit

In 2001, ASARCO Incorporated, the predecessor of ASARCO LLC, and its subsidiaries Lac D'Amiante DU Quebec Ltee and Capco Pipe Company, Inc. (hereinafter jointly referred to as "ASARCO"), filed a lawsuit in the 105th Judicial District Court of Nueces County, Texas. ASARCO named as defendants a number of insurance companies, including Gibraltar Casualty Company, predecessor in interest to Mt. McKinley Insurance Company, and Everest Insurance Company (hereinafter jointly referred to as "Mt. McKinley").[1] The impetus behind the lawsuit was ASARCO's potential liability for "Premises Claims," described in the petition as "claims . . . by employees of independent contractors or by other business invitees . . . who allege injury because of their asserted exposure to asbestos at ASARCO's facilities," [*id.* ¶ 23], and for "Product Claims," which the petition defines as "claims . . . by persons alleging that they have suffered personal injury caused by their asserted exposure to asbestos fiber or asbestos-containing materials produced or sold by [ASARCO]," [*id.* ¶ 29]. The petition made joint allegations against all of the defendant insurance companies, as well as individual allegations against several including Mt. McKinley.

When reduced to their barest terms, the allegations against Mt. McKinley were:

1. Count 1—Declaratory Relief determining the rights and responsibilities for insurance coverage over the premises claims. [*Id.* ¶ 35–41].

2. Count 2—Declaratory Relief determining the rights and responsibilities for insurance coverage over the products claims. [*Id.* ¶ 42–46].

3. Count 3—A breach of contract claim alleging the breach of the various insurance policies in question with respect to the premises claims. [*Id.* ¶ 47–52].

4. Count 4—A breach of contract claim alleging the breach of the various insurance policies with respect to the products claims. [*Id.* ¶ 53–57].

5. Count 11—A breach of contract claim specifically directed against the Mt. McKinley entities for their alleged failure to provide the insurance coverage as required by the applicable policies. The count argued that Mt. McKinley committed the breach by requiring certain proof of claim requirements, which, according to the petition, constituted a unilateral material change of the policies in question. [*Id.* ¶ 83–89].

---

**1.** The Court here cites to the Fifth Amended Original Petition filed in March of 2003, which according to the Parties was the operative petition at the time of the settlement in question. [Doc. No. 3–2].

6. Count 12—An alleged breach of Texas Insurance Code Art. 21.55, which sets out various standards and requirements for the prompt handling and payment of claims. [*Id.* ¶ 90–92].

7. Count 13—An alleged breach of Texas Insurance Code Art. 21.21, in which ASARCO claimed that the Mt. McKinley entities made material misrepresentations of fact or law. [*Id.* ¶ 93–95].

8. Count 14—An allegation that each Mt. McKinley entity breached their duty of good faith and fair dealing. [*Id.* ¶ 96–99].

The prayer in the case sought money damages (in terms of attorneys' fees, expert fees, costs and expenses in the underlying asbestos lawsuits), a declaratory judgment obligating each of the defendant insurance companies to defend and indemnify ASARCO, a declaratory judgment against Mt. McKinley to the effect that its documentation requirements were improper, and interest costs and attorneys' fees in the Nueces County lawsuit itself. [*Id.* at 32–33, 35–36].

Mt. McKinley denied the allegations. ASARCO's and Mt. McKinley's disputes were ultimately settled, and an agreed stipulated order of dismissal was entered on May 16, 2003. [Doc. No. 3–1]. As part of the compromise entered into by the parties, ASARCO agreed to release any and all claims it had against Mt. McKinley, in exchange for a cash payment of twelve million dollars ($12,000,000). This settlement not only had the effect of resolving the litigation, but also gave ASARCO cash it could use to either fund its asbestos fight or for any other purpose. Mt. McKinley paid this sum and in return limited its potential exposure to the asbestos claims, which under its insurance policies could have theoretically reached thirty-seven million five hundred thousand dollars ($37,500,000).[2]

## B. The Bankruptcy

In April of 2005, both of the aforementioned subsidiaries of ASARCO Incorporated filed for bankruptcy, in large part due to these outstanding claims. Later that same year, they were followed into bankruptcy by ASARCO LLC (for a number of reasons, including the possibility of exposure to these asbestos claims). On April 10, 2007, ASARCO's various subsidiaries filed an adversary action against Mt. McKinley seeking to set aside the settlement in the 2001 lawsuit. ASARCO LLC followed suit and filed its separate adversary action in August of that same year, again making essentially the same claims.[3]

The reorganization and confirmation process proceeded, and a conclusion was ultimately reached in late 2009. The Bankruptcy Court entered its Report and Recommendation on September 11, 2009, which ultimately resulted in a final order from this Court on November 11, 2009. [Mem. Op., Order & Inj., *In re ASARCO*

---

**2.** These figures were given to the Court in oral argument by counsel for ASARCO with no objection or correction by Mt. McKinley's counsel, so this Court assumes they are accurate. [Tr. re: Mot. Hr'g at 39:13–24, Oct. 29, 2012, Doc. No. 23]. Nevertheless, counsel also suggested that defense costs could virtually double this figure. [*Id.*]

**3.** The proceeding instituted by the ASARCO subsidiaries was docketed under Adv. No. 07–

2025. The separate proceeding instituted by ASARCO LLC was docketed under Adv. No. 07–2069.

At oral argument, counsel claimed that the subsidiaries had made fraudulent transfer claims under both 11 U.S.C. § 544 and Arizona law, while ASARCO's claims were grounded only in the former. The record suggests that all ASARCO entities made claims under both federal and state law.

*LLC,* 420 B.R. 314 (S.D.Tex.2009) (No. 09–CV–177), Doc. No. 79] [hereinafter "Confirmation Order"]. Two features of the Confirmation Order figure prominently in the early stages of this case. First, the adversary action itself was preserved and assigned to the Asbestos Personal Injury Settlement Trust (hereinafter "the Trust"). [Confirmation Order at 75 ¶ 34; 90 ¶ 74]. This is the same trust to which all personal injury asbestos cases were channeled. [*Id.* at 75 ¶ 32]. Second, as part of this Court's Confirmation and Injunction, all present and future asbestos claims were allowed in the aggregate amount of one billion dollars ($1,000,000,000). [*Id.* at 72 ¶ 19]. The billion dollar trust was to be funded by a five hundred million dollar ($500,000,000) cash payment and a two hundred eighty million dollar ($280,000,000) note. [*Id.*] Additional funds for interest and administrative expenses were also contemplated. [Doc. No. 23 at 51:17–24].

 The Trust in the Court below sought to move this adversary claim to a conclusion. Mt. McKinley filed a Motion to Dismiss based primarily upon the arguments it has made before this Court. First, they contended that the Bankruptcy Court could not go behind the state court's judgment, especially years after that judgment was entered. Their initial argument was based upon a combination *of res judicata,* collateral estoppel and the full, faith and credit that a federal court owes a judgment from a duly constituted and empowered state court. Mt. McKinley's second argument was tied to this Court's Order of Confirmation and ultimate resolution of the entirety of the ASARCO bankruptcy. It contends that all creditors have

been paid in full, complete with interest and attorneys' fees. Therefore, Mt. McKinley argues, the estate has no further interest as a matter of law in pursuing additional fraudulent transfer actions. After much briefing and two full hearings, the Bankruptcy Court denied the Motion to Dismiss. Mt. McKinley now seeks an interlocutory appeal to this Court of the Bankruptcy Court's ruling denying the Motion to Dismiss. The decision to grant or deny an interlocutory appeal of a bankruptcy court order is one committed to the discretion of the district court. *In re O'Connor,* 258 F.3d 392, 399–400 (5th Cir. 2001).[4]

## II. The Motion to Dismiss and the Interlocutory Appeal

A Motion to Dismiss, if successful, can very often dispose of the case, saving the parties both angst and money. Nevertheless, since it is summary procedure at the onset of a case, all contested matters are resolved in favor of the non-movant.

### A. Standard of Review in 12(b)(1) and 12(b)(6) Motions

The Defendants facially attack the complaint. The Court therefore inquires whether the Plaintiff has stated a claim, accepting "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) (internal quotation marks omitted). The court considers "the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir.

---

4. Mt. McKinley filed identical motions in both Adv. No. 07–2025 and Adv. No. 07–2069. The Bankruptcy Court denied the motions in both proceedings on August 13, 2012. Mt. McKinley then filed for leave to appeal both orders, and filed identical motions in this Court. The motions were initially docketed under separate case numbers, Case No. 2:12–cv–271 and Case No. 2:12–cv–275. Pursuant to this Court's order on September 21, 2012, the appeals were consolidated under Case No. 2:12–cv–271. [Doc. No. 8].

2000). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted).

### B. Mt. McKinley's Motion to Dismiss

This Court certainly understands the motivation of Mt. McKinley to have this matter resolved by a Motion to Dismiss. There is the obvious reason that applies in all lawsuits—the granting of a Motion to Dismiss resolves the case without ongoing litigation costs and risks. Additionally, this case raises two particular issues that may have prompted this interlocutory appeal. This matter is being heard more than ten years after Mt. McKinley presumably settled it. Perhaps to Mt. McKinley's mind, these issues were conclusively resolved, and its and ASARCO's asbestos liability were a matter of the past. The thought of trying to litigate the matter now, especially when most of the evidence on the fraudulent transfer issue would not involve Mt. McKinley's own employees, but may in reality only involve the internal machinations of the other side, must, at the very least, be frustrating. Further, should Mt. McKinley lose, the tortuous, complex process of how one would unwind this transaction would puzzle the most dedicated legal scholars. Hypothetically (and without deciding any specific issue) ASARCO might have to return the money it received with interest. Since the asset in question is an insurance policy (and one whose coverage was the subject of litigation), in return for returning the $12 million dollars it received, ASARCO (or the Trust) might regain Mt. McKinley's insurance policy, along with whatever coverage that policy afforded. How that would be done is an entirely new set of problems that will no doubt bedevil both the parties and the Court involved, should the Trust prevail. These are probably just the tip of the iceberg regarding the issues that might arise, but suffice it to say that an ultimate resolution on the merits would not be simple.

Consequently, if appropriate, a Motion to Dismiss would certainly be efficacious. The above-referenced problems (with their attendant costs), when combined with the possibility for judicial efficiency, are certainly good grounds for seeking an interlocutory appeal. Nevertheless, despite there being many good reasons for attempting to streamline this case, this Court hereby **DENIES** the motion for interlocutory appeal. There is no reason to grant an interlocutory appeal unless the Court were in a position to also grant the actual appeal and dismiss the case. Otherwise, instead of simplifying matters, this Court would be adding an additional layer of needless costs and expenses.

This Court **DENIES** the appeal because it cannot grant the Motion to Dismiss based upon the record before it. Keeping in mind that this Court at the dismissal stage must consider all factual allegations made by the Trust to be true, this Court cannot say the matter must be dismissed.

### III. Discussion

In its Motion to Dismiss, Mt. McKinley puts forth two main arguments. The first is based on the full faith and credit that a federal court owes a state court judgment. The second relies more specifically on bankruptcy principles. This Court will address the latter argument first.

## A. The Satisfied Creditors Argument

■ Mt. McKinley argues (not without some authority) that since the plan has been confirmed and all creditors have been paid with interest, the debtor has no legal right to set aside a fraudulent transfer it made. In fact, several courts have reached a similar conclusion.

> It would be a mockery of justice to say that the alleged bankrupt may claim through and in the right of creditors whose debts have been paid and discharged; that he may avoid a transaction, valid as to himself but voidable as to creditors, in the right of non-existing creditors.

*Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir.1950) (quoting *In re J.C. Winship Co.,* 120 F. 93, 96 (7th Cir.1903)).

This holding is not limited to cases using the "old" Bankruptcy Code. As recently as 2008, the court in *Adelphia Recovery Trust v. Bank of America,* 390 B.R. 80 (S.D.N.Y.2008), reached the same conclusion. Relying on the general principles governing federal jurisdiction it wrote:

> It is clear from the Joint Plan's provisions that all of the creditors of the Obligor Debtors have been paid in full. Under the principles of federal jurisdiction, a party does not have standing to sue where the party is not able to allege an injury that is likely to be redressed by the relief sought. Given that the creditors of the Obligor Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on the Bankruptcy Claims at issue here, and the ART [Adelphia Recovery Trust] does not have standing to bring these claims on their behalf.
>
> The ART argues that an indirect benefit to the creditors by way of a more financially sound estate could suffice to provide the necessary benefit, but none of the payouts to the Obligor Debtors' creditors included shares in the ART, according to the terms of the Joint Plans, so there is no apparent benefit that the creditors would accrue from the ART's recovery.

*Id.* at 95 (internal citations omitted). Specifically discussing bankruptcy principles, that Court also wrote:

> The ART also argues in its brief that the Lenders' interpretation of §§ 544 and 548 of the Code wrongly applies § 550's "benefit of the estate" language to these other sections, and that, in any case, the Lenders interpret § 550's "benefit of the estate" language too narrowly. However, the Court agrees with the Lenders that the cases they cite interpreting § 70c of the Bankruptcy Act, and by extension, §§ 544 and 548 of the Bankruptcy Code, *Whiteford Plastics, [Matter of] Vintero [Corp.,* 735 F.2d 740 (2nd Cir.1984) *],* and their progeny, interpret § 70c Bankruptcy Act and §§ 544 and 548 of the Code independently of § 550, without reference to § 550's "benefit of the estate" requirement.
>
> Moreover, even the broad interpretation of § 550's "benefit of the estate" language put forward by the ART in their cited cases does not extend to encompass the instant case ... [T]he terms of the Joint Plan indicate that no creditors of the Obligor Debtors, the specific debtors whose transfers and obligations the ART seeks to avoid, would benefit from recovery on these claims, as all creditors have been paid in full with interest under the Plans, and no creditors have been issued shares of the ART. It is therefore impossible to see how any recovery by the ART could result in any benefit, direct or indirect, to the creditors of the Obligor Debtors.

The Court finds as a matter of law that the terms of the Plans establish that all creditors of the Obligor Debtors have been paid in full and would not benefit from the ART'S recovery on the Fraudulent Transfer Claims ... and that the ART therefore lacks standing to assert these claims. Lenders' motion to dismiss ... is therefore GRANTED as to the Fraudulent Transfer Claims.

*Id.* at 97 (internal citations omitted).[5]

■ While acknowledging both principles underlying the *Adelphia* court's holding to be true, this Court, on the scant record it has before it, must deny Mt. McKinley's motion for three overlapping reasons. In doing so, it acknowledges that, given a more complete record, it might well conclude that the propositions set forth in the appeal are indeed correct. Nevertheless, based upon the minimal record before it, this Court finds that it cannot hold that there is no benefit to the estate because: (1) a fraudulent transfer cause of action must be judged at the time the bankruptcy is filed; (2) this cause of action was part of the consideration assigned to the Trust, and the asbestos claimants (unsecured creditors), who are the beneficiaries of the Trust, were not fully paid at the confirmation; and (3) even if the $1 billion that was to fund the Trust did fully compensate those claimants, the Trust has not yet received that sum and so, even accepting Mt. McKinley's argument, the Trust can pursue any assets it has to make up the gap.

### 1. "For the Benefit of the Estate"

The court in *In re Tronox Inc.*, 464 B.R. 606 (S.D.N.Y.2012), is probably the most recent court to address the issue of whether the language of 11 U.S.C. § 550(a), which states that the debtor/trustee "may recover for the benefit of the estate," not only sanctions fraudulent transfer recoveries but also acts as a damages cap. In that case, Anadarko contended that the "for benefit of the estate" phrase would limit damages to the amount it would take to make the creditors whole. It reasoned that once the creditors had been repaid with interest and attorneys' fees, there could be no pursuit of the fraudulent transfer damages. The Court in *Tronox* rejected this argument for three reasons. First, it found no statutory support for the position that the concept of "the estate" is limited to creditors. Instead, it found that the Bankruptcy Code authorized a broad view of what benefitted the estate.

> Faithful to the language of the statute, the courts have given a very broad construction to the phrase "benefit of the estate." Benefit for purposes of § 550 includes both direct benefits to the estate (*e.g.*, an increased distribution) and indirect ones (*e.g.*, an increase in the probability of a successful reorganization). Furthermore, the benefit from an avoidance action can come from an assignment of a cause of action prior to the litigation's resolution, and need not be obtained at the time of recovery. As the Seventh Circuit held in *Mellon Bank*, [*v. Dick Corp.*, 351 F.3d 290 (7th Cir.2003),] § 550(a) was satisfied because "the potential to recover funds from preference recipients was put to use for the estate's benefit" by facilitating the sale of the debtor:
>
>> Having put the *prospect* of preference recoveries to work for the benefit of

---

5. This Court notes that there seems to be a weighing of the equities being fashioned in this line of cases. These courts seem to imply that it is the height of hutzpah for a debtor to benefit from its own fraudulent conduct. It remains to be seen how these courts would rule if the recipient of the proceeds recovered in a fraudulent transfer action were a trust benefitting injured workers rather than the debtor itself.

all creditors (including the unsecured creditors) *ex ante* by effectively selling them to the secured creditors in exchange for forbearance—and in the process facilitating a swift sale all around—the bankruptcy judge did not need to use them *ex post* a second time, for still another benefit to the estate; there was no further benefit to be had.

*Mellon Bank,* 351 F.3d at 293. In rejecting the argument that proceeds from a litigation trust should be capped at the amount of creditors' claims, the Court in *Kipperman* [*v. Onex Corp.*, 411 B.R. 805, 876 (N.D.Ga.2009),] made this very analogy:

> When a plan distributes stock and the stock appreciates or depreciates in value, section 1129(b) does not compel the bankruptcy court to reassess whether the party receiving the stock has received too much or not enough value relative to the total value of the party's claim and the distributions to the other parties. The court finds this analogy helpful.

*Id.* at 613–14 (internal citations omitted). The *Tronox* Court concluded that once some benefit to the estate is established, the case law did not support the conclusion that § 550(a) provided a cap.

> In other words, the "for the benefit of the estate" clause in § 550 sets a minimum floor recovery in an avoidance action—at least some benefit to the estate—but does not impose any ceiling on the maximum benefits that can be obtained once the floor has been met.... Indeed, it is significant that § 550 provides that the trustee can recover an avoided transfer "for the benefit of the estate" not "to the extent of benefit to the estate."

*Id.* at 614. The court in *Tronox* concluded that the adversary proceeding had already benefitted the estate, since the willingness of the environmental and tort claimants to settle their claims for a relatively small amount of cash and uncertain litigation claims allowed General Unsecured Creditors to obtain security interests, instead of recovering nothing as would have been the case in a liquidation. *Id.* at 615. That reasoning is equally applicable here. The Trust was allotted $1 billion and certain adversary claims, including this one, in lieu of the greater amount it was claiming, and also in lieu of a formal estimation proceeding, which might have established claims well in excess of $1 billion.

### 2. Timing of the Analysis

The bankruptcy petitions were filed in 2005 and the adversary complaints at issue in this case were filed in 2007. The prevailing rule, according to the case law, is that the propriety of an action is to be "evaluated at the time the bankruptcy petition is filed." *In re Mirant Corp.,* 675 F.3d 530, 534 (5th Cir.2012). The Fifth Circuit posited that once a trustee's avoidance rights are triggered, they remain in effect until they will no longer benefit the estate. Here, this claim "benefitted" the estate by serving as compensation/consideration for the asbestos claimants' unsecured claims. One cannot forcefully argue that once this kind of asset is assigned, it immediately becomes unenforceable and worthless merely because the other creditors have been fully compensated. If so, this would effectively be a "bait and switch" on the unsecured asbestos claimants/creditors who are dependent on the Trust.

### 3. The Asbestos Trust Is Not Fully Funded

According to the record before this Court on the Motion to Dismiss, which is admittedly negligible, the Trust, which was allocated $1 billion dollars in the Confirma-

tion Plan, has not received that amount. Consequently, even if Mt. McKinley's argument is correct that the fraudulent transfer cause of action disappears or becomes otherwise unenforceable when the creditors become fully compensated, that situation arguably does not yet exist as to the Trust. It has not been fully funded with the sum of one $1 billion. Consequently, based upon the scarce record this Court has to consider, Mt. McKinley could not prevail, even if it was otherwise correct on the law.

### 4. The Trust Amount Was A Negotiated Result And Was Not Based Upon An Accurate Case By Case Analysis

In the Confirmation Plan adopted by this Court, the channeling injunction forced the Asbestos Personal Injury Claimants to look solely to the Trust for any monetary relief. [Confirmation Order at 72 ¶ 20, 74–78 ¶ ¶ 30–40]. The allowed claims were allowed at an aggregate of $1 billion. [*Id.* at 72 ¶ 19]. The Trust, however, was not actually funded at closing with $1 billion to pay the aggregated claims. [*Id.*] Instead, $500 million in cash and a $280 million note were given as consideration. It was additionally given the right to control all litigation involving asbestos insurance actions and recoveries. [*Id.* at 75 ¶ 34]. The victims of asbestos exposure were to be the sole beneficiaries of the Trust. [*Id.* at 76 ¶ 37]. This Court instructed the Trustees to maximize the assets of the Section 524(g) Trust for the benefit of paying the asbestos claimants. [*Id.*] Thus, this Court in its Confirmation Order contemplated both that the Trust would control just this type of litigation as an asset of the Trust and that the Trustees would maximize this, among other assets, for the benefit of the asbestos claimants.

Counsel for Mt. McKinley argued, again without objection, that the initial range of preconfirmation asbestos estimates went from eighty million dollars ($80,000,000) to approximately two billion dollars ($2,000,-000,000). [Doc. No. 23 at 16:18–20]. Later, counsel for ASARCO stated that some forecasts pegged the amount as high as three billion seven hundred million dollars ($3,700,000,000). [*Id.* at 57:23–25, 58:1–2]. No formal estimation process was instituted, although one was suggested at various times throughout the history of the bankruptcy. Moreover, the asbestos claimants were recognized before, during and after the date of confirmation as being an impaired class, as neither of the proposed plans actually compensated the Trust at an amount high enough to cover the high end of the estimate. The Trust argues in this Court that any assets they recover should go to the benefit of the Trust, clearly the opposite argument of Mt. McKinley. This is an issue that should not be decided on a Motion to Dismiss, especially given the other issues at play. A complaint:

> ... should not be dismissed merely because ... the district court believes that the case is legally or factually doubtful or that it is unlikely that the plaintiff will prevail in the action on the merits. Whether the plaintiff can prevail on the merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial ... and not merely on the face of the pleadings.

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed.). This Court cannot merely on the record it has before it hold that the Bankruptcy Court's holding was in error.

### B. Estoppel by the State Court Judgment

 In addition, Mt. McKinley argues that a federal court must give a state court judgment the full faith and credit that it would give a ruling of another federal court. This Court agrees with that basic

proposition. Mt. McKinley further argues that if one agrees with that basic premise, then there can be no fraudulent transfer when that transfer is the result of a state court judgment. Counsel has forcefully grounded this argument on two Fifth Circuit cases: *In re Besing*, 981 F.2d 1488 (5th Cir.1993), and *In re Erlewine*, 349 F.3d 205 (5th Cir.2003). Both cases do support Mt. McKinley's argument that a bankruptcy court should give deference to a judgment from a duly empowered state court, provided that such judgment was otherwise free from collusion or any other irregularity. *See Besing*, 981 F.2d at 1496; *Erlewine*, 349 F.3d at 210. While correct in principle, what counsel neglects is that neither the *Besing* nor the *Erlewine* case was decided on any of the grounds Mt. McKinley is now arguing.

*Erlewine* was resolved on cross-motions for summary judgment, after which the court affirmed the bankruptcy court's finding that the Trustee/Debtor had received reasonably equivalent value pursuant to the divorce decree at issue, thus negating the claim of fraudulent transfer. 349 F.3d at 212–13. *Besing*, while actually being dismissed by the bankruptcy court because it held the state judgment in question was not a transfer, 981 F.2d at 1491, was affirmed by the Fifth Circuit on the basis that the state trial court had decided that the Debtors' claims had no merit, *id.* at 1496. Since the claims had no merits, the transfer was as a matter of law one for reasonably equivalent value, again negating any claim for fraudulent transfer. *Id.* at 1496. This Court does not have enough of a record to either grant a summary judgment or to rule as a matter of law that reasonably equivalent value was transferred.[6] Indeed at oral argument, counsel

for Mt. McKinley told the Court that the settlement agreement—the very document that would exhibit the *quid pro quo* and perhaps therefore the existence of reasonably equivalent value—was not relevant to the appeal. [Doc. No. 23 at 9:10–12, 11:19–22].

Additionally, the Fifth Circuit emphasized in *Besing* that its decision "does not address the issue of claims lost or forfeited by a debtor with the actual intent to defraud creditors of the bankruptcy estate." 981 F.2d at 1496 (citing 11 U.S.C. § 548(a)(1)). The Circuit in reaching its decision in *Erlewine* also specifically stressed that the state court judgment was not the result of "collusion, sandbagging, or indeed any irregularity. . . ." 349 F.3d at 213. The very petition here, however, suggests that the settlement in question involved some irregularity. Thus, this Court cannot, on the slim record before it, summarily dispose of the claims.

## IV. Conclusion

For the reasons set forth above, this Court would not be in a position to grant the Motion to Dismiss based solely upon the pleadings. As such, there is no purpose served in granting an interlocutory appeal. The Court emphasizes that the statements made and issues raised in this Order are based upon an incomplete record, and that *nothing* this Court has raised herein should be interpreted as to how this Court might ultimately rule with a more complete record on either an appeal from an order granting a motion for summary judgment, or an appeal after a trial on the merits. Nor should anything be read as predicting, suggesting or otherwise ordering the Bankruptcy Court to consider or not consider any complaint or defense.

---

6. One would assume, however, that if the Mt. McKinley entities paid $12 million for the release of ASARCO's state court claims, that those claims were not, as a matter of law, meritless.

This order should be read for the purpose it was written—to rule solely on the issue of an interlocutory appeal—nothing more. The motion for an interlocutory appeal is DENIED.