**In re WOOD TREATERS, LLC, Debtor.**

**Doreen Abbott, Chapter 7 Trustee, Plaintiff,**

v.

**Arch Wood Protection, Inc., Defendant.**

Bankruptcy No. 3:09–bk–1895–PMG.
Adversary Nos. 3:11–ap–205–PMG, 3:11–ap–206–PMG, 3:11–ap–208–PMG, 3:11–ap–209–PMG, 3:11–ap–210–PMG, 3:11–ap–211–PMG, 3:11–ap–213–PMG.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

April 22, 2013.

Eyal Berger, Akerman Senterfitt, Fort Lauderdale, FL, Jacob A. Brown, Katherine Coxe Fackler, Akerman Senterfitt, Jacksonville, FL, for Plaintiff.

Alessandro A. Apolito, Robert D. Wilcox, Brennan, Manna & Diamond, PL, Jacksonville, FL, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in these adversary proceedings. The proceedings were consolidated for purposes of trial.

Doreen Abbott, as Chapter 7 Trustee, commenced the proceedings by filing seven Complaints to Avoid Post–Petition Transfers against the named Defendants. The proceedings were brought pursuant to § 549 of the Bankruptcy Code, which generally provides that a trustee may avoid unauthorized, post-petition transfers of estate property. The transfers at issue in this case were payments made by the Debtor to the Defendants for the purchase of goods related to the lumber business.

To establish standing to avoid a transfer under § 549, the Trustee must show as a jurisdictional requirement that the estate suffered an injury as a result of the transfer. To address this requirement at trial, the Trustee introduced evidence that the overall value of the bankruptcy estate was diminished by the transfers to the Defendants, because the transfers had the aggregate effect of decreasing the Debtor's ultimate liquidation value.

The Trustee failed to satisfy her burden of proving that she has standing to bring the avoidance actions. To establish an avoidance claim, a trustee must prove every required element with respect to each transfer that she seeks to avoid. In this case, the Trustee did not prove that any specific transfer injured the estate, because she did not show that the goods purchased in any specific transaction either (1) were not fair value for the purchase price, or (2) were re-sold at a loss by the Debtor or the liquidator. The Trustee lacks standing to avoid the transfers, and a judgment should be entered in favor of the Defendants.

### Background

The Debtor, Wood Treaters, LLC, filed a petition under Chapter 11 of the Bankruptcy Code on March 16, 2009, and was authorized to operate its business pursuant to § 1108 of the Bankruptcy Code. The business of the Debtor involved the manufacture and sale of preserved wood products and other building supplies.

The parties have stipulated to the following facts regarding the Debtor's Chapter 11 case:

1. On March 25, 2009, the Debtor filed a Motion for Authority to use the cash collateral of Regions Bank (Regions). Prior to the petition date, Regions held a perfected, first priority security interest in virtually all of the Debtor's assets. (¶¶ 4, 5, 6).

2. The Court entered interim Consent Orders authorizing the Debtor to use Regions' cash collateral on April 22, 2009, and May 19, 2009, and entered a

Final Consent Order allowing the use of cash collateral on August 12, 2009. (¶¶ 8, 10, 11).

3. Regions subsequently transferred its claim to 2010 Angelina Capital Fund, LLC (Angelina). (¶ 14).

4. The Debtor operated its business under Chapter 11 for more than sixteen months. (¶ 20).

5. On July 26, 2010, the Court entered an Order converting the Debtor's Chapter 11 case to a case under Chapter 7. (¶ 19).

(Docs. 146, 147, Trial Memoranda, Statements of Uncontested Facts).

The Final Consent Order Allowing the Use of Cash Collateral established a baseline balance of the total value of the Debtor's accounts and inventory as of a specific date. Generally, the Debtor was authorized to use cash collateral. However, if during operations the combined balance of the Debtor's deposit accounts, accounts receivable up to a certain amount, and inventory decreased below the baseline balance, the Debtor was required to pay Regions an additional adequate protection payment, and the Debtor was not authorized to use cash collateral until the additional adequate protection payment was made. The Debtor was also required to provide financial information to Regions twice each month, and Regions had the right to inspect all records reflecting the use of cash collateral.

On April 19, 2011, after the conversion of the Chapter 11 case to a Chapter 7 case, the Trustee filed ten Complaints to Avoid Post–Petition Transfers. In each of the Complaints, the Trustee alleged that the Debtor transferred funds to the respective defendant during the course of the Chapter 11 case, and that the transfers were not authorized because they were in violation of the Cash Collateral Orders. According to the Trustee, the transfers vio-

lated the Cash Collateral Orders because they occurred while the combined balance of the Debtor's accounts and inventory was less than the baseline balance. Consequently, the Trustee seeks to avoid and recover the transfers pursuant to § 549 and § 550 of the Bankruptcy Code.

Seven of the Trustee's ten adversary proceedings are currently before the Court. The named Defendant in each proceeding, and the range of dates for the alleged transfers, are as follows:

1. Adv. No. 11–205—six transfers to Arch Wood Protection, Inc. between April 8, 2010, and July 7, 2010.

2. Adv. No. 11–206—eighteen transfers to Cochran Forest Products, Inc. between April 2, 2010, and July 20, 2010.

3. Adv. No. 11–208—sixteen transfers to Tatum Brothers Lumber Company, Inc. between April 8, 2010, and July 21, 2010.

4. Adv. No. 11–209—fourteen transfers to Varn Wood Preserving Company, LLC between April 2, 2010, and July 20, 2010.

5. Adv. No. 11–210—five transfers to Tolleson Lumber Company between April 8, 2010, and July 21, 2010.

6. Adv. No. 11–211—five transfers to Claude Howard Lumber Company, Inc. between May 6, 2010, and July 14, 2010.

7. Adv. No. 11–213—five transfers to Byrd Transportation, Inc. and WL Byrd Lumber Company, Inc. between May 6, 2010, and July 21, 2010.

The parties have stipulated that all of the Defendants sold goods to the Debtor, that the Debtor transferred estate property to the Defendants post-petition, and that the transfers were transfers of the cash collateral of either Regions or Angelina. (Docs. 146, 147, Trial Memoranda, Statement of Uncontested Facts, ¶¶ 21, 23, 31, 32).

## Discussion

■ The Complaints were brought pursuant to § 549 of the Bankruptcy Code. Generally, § 549 provides that a trustee may avoid a post-petition transfer of property of the estate that is not authorized by the Bankruptcy Code or the Court. 11 U.S.C. § 549(a). In determining whether a post-petition transfer of cash collateral is "authorized," Courts look to § 363(c)(2) of the Bankruptcy Code, which provides that a Chapter 11 debtor may not use cash collateral unless the secured creditor consents, or the Court has authorized its use. 11 U.S.C. § 363(c)(2).

In this case, the Trustee asserts that the Debtor's payments to the Defendants were not authorized, because neither Regions nor Angelina consented to the use of their cash collateral outside the terms of the Cash Collateral Orders, and because the Debtor was not in compliance with the Orders at the time that the transfers were made. According to the Trustee, the transfers were not in compliance with the Orders because they occurred while the combined balance of the Debtor's accounts and inventory was less than the baseline balance.

### A. Standing

■ On June 25, 2012, the Court entered an Order denying the Cross–Motions for Summary Judgment of the Trustee and the Defendants. In that Order, the Court found that "as a jurisdictional matter, the Trustee must establish that the estate suffered an injury that is redressable by a judgment in her favor," and that summary judgment was not appropriate in this case "because issues of fact exist regarding whether the estate was diminished as a result of the Debtor's transfers to the Defendant." *In re Wood Treaters, LLC,* 479 B.R. 122, 133 (Bankr.M.D.Fla.2012). Specifically, the Court stated:

Any party who invokes federal jurisdiction "bears the burden of demonstrating his standing to sue. To demonstrate standing, a party must show: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *In re Whittle,* 449 B.R. 427, 429 (Bankr.M.D.Fla.2011)(citing *Mulhall v. UNITE HERE Local 355,* 618 F.3d 1279, 1286 (11th Cir.2010)).

*In re Wood Treaters, LLC,* 479 B.R. at 127. In other words, for constitutional standing, a plaintiff is required to have suffered an injury that is concrete and actual. *In re Mirant Corporation,* 675 F.3d 530, 533 (5th Cir.2012). To satisfy this constitutional requirement of standing in an avoidance action under § 549, the Court determined that the Trustee must establish that the estate suffered an actual injury as a result of the transfers that she seeks to avoid.

In reaching this determination, the Court first distinguished the factual and legal predicates underlying *In re Delco Oil, Inc.,* 599 F.3d 1255 (11th Cir.2010). The Court then relied on a number of authorities regarding the standing requirement in general, and also on the requirement's specific application to § 549. In *In re Indian Capitol Distributing, Inc.,* 2011 WL 4711895, at *6–7 (Bankr.D.N.Mex.), for example, the Bankruptcy Court had recognized the "core requirement" of an injury to the estate in an action to avoid post-petition transfers under § 549. And in *In re PSA, Inc.,* 335 B.R. 580 (Bankr. D.Del.2005), the Bankruptcy Court had recognized that the fundamental purpose of § 549 is to allow the trustee to avoid post-petition transfers *that deplete the estate. In re PSA, Inc.,* 335 B.R. at 584 (quoted in *In re Tolkin,* 2011 WL 1302191,

at *5 (Bankr.E.D.N.Y.) (Emphasis supplied.)).

Since the entry of this Court's Order denying the parties' cross-motions for summary judgment, at least three Courts appear to have accepted the conclusion that a trustee must show injury to the estate to prevail in an action under § 549.

First, in *In re C.W. Mining Company*, 477 B.R. 176, 185, 189 n. 47 (10th Cir. BAP 2012), the Bankruptcy Appellate Panel acknowledged this Court's decision that a trustee has no standing to bring a § 549 claim if no injury can be shown, and also stated that where "there was no actual depletion of the bankruptcy estate by the admittedly unauthorized post-petition Transfer, avoidance and recovery does not fulfill the purpose of § 549(a)." Second, in evaluating whether a § 549 action would benefit the estate, the Court in *In re Duckworth*, 2012 WL 4434681, at *4 (Bankr.C.D.Ill.), cited this Court's decision for the principle that "injury to the estate is relevant to whether a trustee may avoid a postpetition transfer under section 549," and indicated that the lack of harm to the estate provides a valid basis to deny avoidance under § 549. Finally, in *In re Dooley's Rainwater Conditioning, Inc.*, 2012 WL 6737501, at *3 (Bankr.D.Kan.), the issue was whether certain post-petition transfers were authorized as "ordinary course of business" transactions, and the Court noted that the purpose of § 549 is to allow the avoidance of post-petition transfers that diminish the estate.

## B. Burden of proof

■ Rule 6001 of the Federal Rules of Bankruptcy Procedure provides the general rule regarding the burden of proof in an action to avoid a post-petition transfer under § 549. The Rule states that "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." Fed.R.Bankr.P. 6001. Under this Rule, the trustee must first show that a post-petition transfer of estate property has occurred, and the ultimate burden then shifts to the defendant to show the validity of the transfer. See *Springel v. Prosser*, 2012 WL 2149737, at *1 (D.Vi.); *In re Hawaiian Telcom Communications, Inc.*, 2012 WL 273614, at *2 (Bankr.D.Hawai'i).

■ As shown above, however, the Trustee must satisfy the constitutional requirement of standing by establishing that the estate suffered an injury as a result of the transfers. "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merit[]s of a party's claims." *In re Fontainebleau Las Vegas Contract Litigation*, 716 F.Supp.2d 1237, 1247 (S.D.Fla.2010)(quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005), and *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)).

■ It is the Trustee's burden to prove her standing to bring a claim under § 549 of the Bankruptcy Code as part of her initial showing. See *In re Fontainebleau Las Vegas Contract Litigation*, 716 F.Supp.2d at 1247(Citations omitted).

[The Plaintiff], as the party invoking this Court's jurisdiction, has the burden of proving standing. *See In re La Sierra Financial Services, Inc.*, 290 B.R. 718, 726 (9th Cir. BAP 2002) ("The party asserting standing bears the burden of proving it."); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("The burden to establish standing remains with the party claiming that standing exists"); *E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 984 (11th Cir.1990) ("When standing has been contested, it is the burden of the party

claiming standing"); *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 662 (D.R.I. 1998) ("The burden of proof must be carried by the party whose standing is questioned.").

*In re Sewell,* 413 B.R. 562, 568 (Bankr. E.D.Tex.2009). Clearly, the Trustee bears the burden of proving her standing to bring the avoidance action, and therefore bears the burden of proving that the estate suffered an injury as a result of the transfers that she seeks to avoid. The disputed fact of injury to the estate "must be supported adequately by the evidence adduced at trial." *In re Sewell,* 413 B.R. at 568 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979))).

 Additionally, the injury to the estate must be established as to each transfer alleged in the Complaint. "While the Trustee can plead his case in general terms, he must offer proof of every element of each particular cause of action *for every transfer that he seeks to avoid.*" *In re Schraiber,* 1992 WL 280801, at *9 (Bankr.N.D.Ill.) (Emphasis supplied).

Section 549(a), for example, provides that the trustee may avoid "a transfer of property of the estate" that occurs after the commencement of the case, and that is not authorized by the Bankruptcy Code or the Court. 11 U.S.C. § 549(a). It is the occurrence of "a transfer," therefore, that is the operative event for each avoidance claim by the trustee.

 The independence of each transfer as a separate claim is further illustrated by § 549(d) of the Bankruptcy Code, which requires the limitations period to be calculated separately for each transfer. 11 U.S.C. § 549(d). Consequently, where multiple post-petition transfers are alleged

in a single avoidance action, the statute of limitations provided by § 549(d) must be evaluated separately for each transfer, and may result in the dismissal of some, but not all, of the trustee's claims. See *In re West,* 474 B.R. 191, 197 (Bankr.N.D.Miss. 2012)(The statute of limitations for seven out of eight post-petition transfers had expired, but the trustee's claim regarding the eighth transfer was not barred by § 549(d) because "its two year period" had not passed when the action was filed.).

 Each transfer is a separate claim under § 549(a), and it is the Trustee's burden to prove her standing to seek the avoidance of each transfer alleged in her Complaints.

## C. The Trustee's evidence on standing

To establish her standing, the Trustee presented the Expert's Report and testimony of Daniel Edelman (Edelman). Edelman is a certified public accountant, and was qualified as an expert in the fields of forensic accounting and business valuation. (Transcript, pp. 17, 20).

Among other issues, Edelman was asked by the Trustee to provide an opinion with respect to "whether the value of the Estate was diminished as a result of the Unauthorized Transfers." (Trustee's Exhibit 1, Section I.c). Edelman's opinion regarding this issue is summarized in his Report as follows:

> **The value of the Estate was diminished as a result of the Unauthorized Transfers.** This opinion is based on my calculation of the estimated proceeds that would have been realized from the liquidation of the Estate had it been converted to Chapter 7 at the end of January 2010 (the month of the Default Date) rather than as actually occurred, in July 2010. (see Exhibit 4). The Un-

authorized Transfers were mostly for inventory purchases and constituted 45% of Debtor's total operating payments during this period (see Exhibit 3), essentially allowing Debtor to continue operations. Between January and June 2010, Debtor significantly depleted cash while building up inventory (including chemicals inventory), effectively converting cash to inventory, which had a much lower recovery rate in liquidation (see Exhibit 5). This buildup was inconsistent with sales activity during the same period. By June 2010, debtor's inventory to sales ratio had increased dramatically from its levels prior to the inventory buildup (see Exhibits 6 and 6A). The additional time also decreased the value of Debtor's equipment, which depreciated every month that it was in use. The cumulative effects were lower total asset values and lower proceeds realized from liquidation (see Exhibit 4).

(Trustee's Exhibit 1, Section II.c). Edelman testified at length at trial. For purposes of his Report, he fixed January 6, 2010, as the date that the Debtor defaulted under the Cash Collateral Orders. (Trustee's Exhibit 1; Transcript, p. 30). According to Edelman, if the Debtor's assets had been liquidated at the end of that month, on January 31, 2010, the assets would have yielded the sum of $1,282,734.00.

The Debtor purchased goods from the Defendants between April 2, 2010, and July 21, 2010, and Edelman testified that the Debtor's sales were "flat" during the period of the purchases. Because the Debtor wasn't re-selling its inventory "quick enough," Edelman testified that the Debtor's cash levels declined and its inventory levels increased as a result of its purchases from the Defendants. Since the liquidation value of inventory is less than the 100% liquidation value of cash, Edelman testified that the total value of the

Debtor's assets decreased with every purchase of inventory from the Defendants.

The Debtor's Chapter 11 case was converted to a case under Chapter 7 on July 26, 2010, and the Debtor's assets were subsequently liquidated for the sum of $822,819.00. Consequently, Edelman subtracted the actual, post-conversion liquidation proceeds ($822,819.00) from the estimated, pre-conversion liquidation value as of January 31, 2010 ($1,282,734.00), and concluded that the estate diminished by the sum of $459,915.00 as a result of the transfers. (Transcript, pp. 33–40).

■■■ The Trustee's evidence does not establish that the bankruptcy estate suffered an injury as a result of any particular transfer. Specifically, the evidence does not show that the goods purchased in any specific transaction (1) were not fair value for the purchase price, or (2) were re-sold at a loss by the Debtor or the liquidator. Accordingly, the Trustee has failed to satisfy her burden of proving that she has standing to bring the avoidance actions.

### 1. Fair value for purchase price

First, the evidence does not show that the goods purchased from the Defendants were worth less than the fair value of the purchase price paid by the Debtor. In fact, for purposes of his analysis, Edelman assumed that the opposite was true, and that the Debtor received fair value for its purchases. Edelman's testimony at trial includes the following:

A: Again, as I testified at my deposition, the assumption that I made for all of the work that I did—and I've said previously that *I assumed that there was fair value for the product—the purchases were a fair value for the product received.*

Q: I'm going to ask you if you made this statement. And this is page 109, lines 4 and 5. "Well, I think that again the best indication of value is always what is an arm's length transaction."

A: I would agree with that statement today.

Q: But you have no reason to believe that this was not an arm's-length transaction, correct?

A: I have no reason to believe that, and *I have assumed that all of the purchases were at arm's length for fair value.*

(Transcript, pp. 105–06)(Emphasis supplied). Edelman later testified that he "assumed throughout that there was fair value for inventory purchased throughout the whole time period that we're dealing with." (Transcript, p. 118).

Edelman's testimony was not contradicted at trial, and the Trustee acknowledges that the Debtor received goods from the Defendants in accordance with their customary business relationships. (Doc. 146, Trustee's Trial Memorandum, Statement of Uncontested Facts, ¶ 22). The evidence does not establish that the goods purchased from the Defendants were not fair value for the purchase price paid by the Debtor.

### 2. Re-sale by the Debtor or the liquidator

Second, the evidence does not establish that the goods purchased from a Defendant in any specific transaction were re-sold at a loss by the Debtor or the liquidator.

As an initial matter, it is significant that Edelman's analysis does not include any identification of the goods purchased by the Debtor in the transactions at issue, or any tracing of those goods through the Debtor's inventory to their ultimate disposition. When questioned regarding a specific purchase from Cochran Forest Products, for example, Edelman testified as follows:

Q: And you haven't reviewed the debtor's purchase order relating to this transaction or any other transaction, have you?

A: That's correct.

Q: Have you reviewed any invoice that Cochran Forest Products provided with regard to this transaction?

A: No, I have not.

Q: *Is it fair to say that you do not know what was purchased as part of this transaction?*

A: *It is fair to say I do not know.* And again, as I've stated, I think I've clearly stated the broad assumptions in the manner that I've prepared my report. But I'm happy to—

Q: Okay.

A: If we want to go through these 60 items, I'm happy to do that.

Q: Well, we're not going to go through 60 items, because I'm guessing your answer is going to be the same for all of them.

A: Correct.

Q: And you don't know what goods were received by the debtor in exchange for that $12,317.93, do you?

A: Again, specifically, no, I do not. But generally speaking, I understand that they were purchasing inventory from the debtors—from these defendants. I'm sorry.

(Transcript, pp. 107–08)(Emphasis supplied). Edelman's Report does not identify the goods purchased by the Debtor in the transactions at issue.

Consequently, Edelman's analysis does not trace a specific Defendant's goods through the Debtor's inventory, or show whether the goods purchased from a spe-

cific Defendant were ultimately re-sold by the Debtor or by the liquidator. In other words, the Court cannot determine from the evidence whether a specific Defendant's products were re-sold by the Debtor while it operated its business in the Chapter 11 case, or whether the products remained in inventory at the time of the post-conversion liquidation.

A: ... This is an average of the whole bucket of inventory.

Q: And you don't know which bucket my clients' goods fell into, do you?

A: No, I do not.

Q: *And you don't even know why they made it to the bucket at the end, because they may have been sold by the debtor during the course of the case?*

A: *Well, I would say, again, do I know specifically? No.*

(Transcript, pp. 93–94) (Emphasis supplied). The evidence does not establish whether the goods purchased from a specific Defendant were re-sold by the Debtor while it operated its business in the Chapter 11 case, or whether they were re-sold by the liquidator after the case had been converted to a case under Chapter 7.

Finally, Edelman's Report does not establish whether the goods purchased from a specific Defendant were ultimately re-sold by the Debtor or liquidator at a profit or a loss.

Q: Now, what if some of the inventory was sold at a hundred percent of cost? How would that affect your analysis?

A: Well, again, and this is looking at a bucket of everything. Some of it may have been sold at 100 cents and some of it may have been sold at 10 cents. This is an average of the whole bucket of inventory.

. . .

Q: Let me see if I can simplify this. Do you know whether at least some portions of the inventory that were left at the time of liquidation were sold at a hundred percent of the debtor's cost?

A: I don't know. It was not—again, I looked at it, as I have said earlier, as a basket of assets and what was the total value of what was sold in that percentage. I did not look at any specific line item.

. . .

Q: Okay. So your answer is you're not aware as to whether any inventory was sold for a hundred percent of the debtor's costs; is that your testimony?

A: Correct.

(Transcript, pp. 93–94, 102–03). With respect to a purchase of particular goods from Cochran Forest Products, for example, Edelman testified that he didn't know whether the Debtor re-sold the purchased goods, whether the goods were re-sold by the liquidator as part of the inventory that remained when the Debtor ceased operating, or whether the goods were re-sold at a profit. (Transcript, p. 109).

The evidence does not establish that the goods purchased from a Defendant in any specific transaction were re-sold at a loss by the Debtor or by the liquidator.

**D. Failure to satisfy the burden**

As shown above, Edelman's Report does not establish that the goods purchased by the Debtor were not fair value for the purchase price. Additionally, the Report does not identify the goods received by the Debtor in any specific purchase, or establish when specific goods were re-sold, or establish the amounts that the goods yielded upon re-sale. On the contrary, the Report was prepared to provide a "broader perspective as far as the overall operation of the business during the period of

time from 2009 through shutdown." (Transcript, pp. 110–11).

Given the scope of his analysis, therefore, Edelman acknowledged that his Report does not conclude that each separate transfer damaged the estate.

Q: Where in your report do you say that each individual payment to the debtor [sic] caused damage to the estate?

A: Specifically, I don't say that. I think again it was within, again, the explanation of Exhibit 4 and the direct examination questions that were asked.

Q: Okay. So you would agree that there's nowhere in your report that you make a link between any individual transfer to any of my clients to any particular element of damage for the estate?

A: I believe as far as this is written in the report and the manner that it is written, I don't believe that that linkage, per se, is there; it is in the testimony given.

(Transcript, pp. 94–95). When asked to explain how much damage a particular purchase from Cochran Forest Products caused to the estate, for example, Edelman acknowledged that he could not provide a fixed amount. (Transcript, p. 110).

The Trustee bears the burden of proving that she has standing to seek the avoidance of each transfer alleged in her Complaint. To establish her standing, the Trustee was required to show that the specific transfers caused an injury to the estate. The evidence does not establish that the goods purchased in the individual transactions were not fair value for the purchase price, or that the goods were ultimately re-sold at a loss. Absent evidence establishing the diminished value, the Trustee has not satisfied her burden of showing that any specific transfer caused an injury to the estate.

## Conclusion

The Trustee commenced these proceedings by filing seven Complaints to Avoid Post–Petition Transfers against the named Defendants. The proceedings were brought pursuant to § 549 of the Bankruptcy Code, which generally provides that a trustee may avoid unauthorized, post-petition transfers of estate property. The transfers at issue in this case were payments made by the Debtor to the Defendants for the purchase of goods related to the lumber business.

To establish standing to avoid a transfer under § 549, the Trustee must show as a jurisdictional requirement that the estate suffered an injury as a result of the transfer. To address this requirement at trial, the Trustee introduced evidence that the overall value of the bankruptcy estate was diminished by the transfers to the Defendants, because the transfers had the aggregate effect of decreasing the Debtor's ultimate liquidation value.

The Trustee did not satisfy her burden of proving that she has standing to bring the avoidance actions. To establish an avoidance claim, a trustee must prove every required element with respect to each transfer that she seeks to avoid. In this case, the Trustee did not prove that any specific transfer injured the estate, because she did not show that the goods purchased in any specific transaction either (1) were not fair value for the purchase price, or (2) were re-sold at a loss by the Debtor or the liquidator. The Trustee lacks standing to avoid the transfers, and a judgment should be entered in favor of the Defendants.

Accordingly:

**IT IS ORDERED** that:

1. The transfers alleged in the Trustee's Complaint to Avoid Post–Petition

Transfers are not avoided pursuant to § 549 of the Bankruptcy Code.

2. A Final Judgment in favor of the Defendant, Arch Wood Protection, Inc., and against the Plaintiff, Doreen Abbott as Chapter 7 Trustee, shall be entered consistent with this Opinion.

3. Separate Final Judgments shall be entered in each of the above-captioned adversary proceedings. **DATED** this 22 day of April, 2013.